This Opinion Is a
Precedent of the TTAB

Mailed: January 24, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*Monster Energy Company*
*v.*
*Chun Hua Lo*
_____

Opposition No. 91225050
_____

Nicole R. Townes of Knobbe Martens Olson & Bear LLP for Monster Energy Company.

Arthur A. Chaykin of Kennyhertz Perry LLC for Chun Hua Lo.
_____

Before Zervas, Kuhlke, and Dunn, Administrative Trademark Judges.

Opinion by Dunn, Administrative Trademark Judge:

Chun Hua Lo ("Applicant") filed an application to register on the Principal

Register the mark , ICE disclaimed, for services amended to

"restaurants, coffee shops, ices parlors, snack bars with take-out for flavored and fruit

ice products, and specifically excluding frozen yogurt" in International Class 43.[1]

---

[1] Application Serial No. 86274025 was filed May 7, 2014 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based upon Applicant's allegation of a bona fide intention to use the mark in commerce. The description of the mark "[t]he mark consists of the words 'ICE MONSTER' where the word 'ICE' is contained within a vertical blue rectangular shape, followed by the word 'MONSTER', all in a stylized, irregular font in the color blue. The color

Monster Energy Company (Opposer) filed a notice of opposition against the registration of Applicant's mark.[2] As amended, the operative notice of opposition pleads 18 registered marks encompassing or including the terms MONSTER ENERGY or MONSTER in connection with energy drinks, supplements, and restaurant and bar services. Opposer claims those marks are famous, have been used and promoted as a family of marks, and that Applicant's mark so resembles Opposer's marks as to be likely, when used on or in connection with Applicant's services, to cause confusion, or to cause mistake or deception under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d). Opposer attached status and title copies of the pleaded registrations to the notice of opposition. Opposer also pleads that Applicant lacked a bona fide intent to use the mark in commerce with the listed services when he filed his application under Section 1(b) of the Trademark Act.[3]

Applicant's answer to the amended notice of opposition denies its salient allegations.[4]

---

white represents transparent area and is not claimed as a feature of the mark;" and "[t]he [color] blue [is] claimed as a feature of the mark."

[2] 1 TTABVUE. Citations to TTABVUE are to the Board's public online database that contains the proceeding file, available at www.uspto.gov. The first number represents the docket number and any second number represents the page in the TTABVUE electronic proceeding file.

[3] 14 TTABVUE (amended pleading) and 17 TTABVUE (Board order accepting amended pleading).

[4] 23 TTABVUE. Although Applicant's answer refers to "affirmative defenses," as the Board has previously observed, Applicant did not plead any affirmative defenses (54 TTABVUE 9-11), and we do not consider them to be before us. Further, on November 18, 2018, the Board dismissed Applicant's counterclaims against pleaded Registration Nos. 5114853 and 5114854 for ENERGY MONSTER (one in standard characters and the other with design), both for

The likelihood of confusion claim with respect to the individual pleaded marks was briefed. Opposer's main brief does not address Opposer's lack of a bona fide intent to use claim, or Opposer's alleged family of marks.

Because Opposer did not argue the claims in its brief, we find that Opposer has waived its lack of a bona fide intent to use claim, and - to the extent that it claims likelihood of confusion based on a family of marks - has waived that portion of its likelihood of confusion claim. *See Alcatraz Media, Inc. v. Chesapeake Marine Tours Inc.,* 107 USPQ2d 1750, 1753 (TTAB 2013)*, aff'd mem.,* 565 F. App'x 900 (Fed. Cir. 2014*); Joel Gott Wines LLC v. Rehoboth Von Gott Inc.,* 107 USPQ2d 1424, 1426 n.3 (TTAB 2013) *(citing Knight Textile Corp. v. Jones Invest. Co.,* 75 USPQ2d 1313, 1314 n.4 (TTAB 2005)).

For the reasons set forth below, we sustain the opposition.

## I.   EVIDENTIARY RECORD

The pleadings are automatically of record. *Wirecard AG v. Striatum Ventures B.V.,* 2020 USPQ2d 10086, at*2 (TTAB 2020). Pursuant to Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), so is Applicant's opposed application. In addition, the parties introduced the following evidence:

---

"restaurant services, bar services," when the Board granted Opposer's motion for summary judgment. 54 TTABVUE.

### A. Opposer's evidence

### 1. Pleaded Registrations

Opposer's 18 pleaded registrations are identified below by registration number, year of issue, mark (in standard characters except in two instances), and abbreviated descriptions of their respective goods and services:[5]

3044314 (2006) M MONSTER ENERGY (ENERGY disclaimed)
    nutritional supplements

3044315 (2006) MONSTER ENERGY (ENERGY disclaimed)
    nutritional supplements

3057061 (2006) MONSTER ENERGY (ENERGY disclaimed) carbonated drinks
    enhanced with vitamins, shelf stable fruit juice drinks

3134841 (2006)  (ENERGY disclaimed)
    carbonated drinks with vitamins, shelf stable fruit juice drinks

3134842 (2006) M MONSTER ENERGY (ENERGY disclaimed)
    carbonated drinks with vitamins, shelf stable fruit juice drinks

---

[5] 14 TTABVUE 26-135. Opposer errs in contending (112 TTABVUE 12) that the pleaded registrations are accompanied by their "file histories." Opposer included only the necessary status and title information to for each registration. "File histories" are USPTO records that reflect the entire prosecution from the filing of the application to the time the "history" is submitted, and not merely the summary pages reflecting current status and title. *Cf. Cold War Museum Inc. v. Cold War Air Museum Inc.*, 586 F.3d 1352, 92 USPQ2d 1626, 1629 (Fed. Cir. 2009) (discussing how file history for involved application is automatically of record).

In addition, Opposer submitted duplicate copies of the pleaded registrations that were already submitted with its notice of opposition (71 TTABVUE 16-98). This was not necessary, burdens the Board's review of evidence in the record, and wastes resources of the parties.

Furthermore, after Opposer submitted its notice of opposition the USPTO cancelled four of the pleaded registrations (Nos. 3939395, 3966554, 4147220, and 4269880) and they are given no further consideration. A cancelled or expired registration is not evidence of any presently existing rights in the mark shown or that the registrant ever used the mark. *Action Temp. Servs. Inc. v. Labor Force Inc.*, 870 F.2d 1563, 10 USPQ2d 1307, 1309 (Fed. Cir. 1989); *Kemi Organics, LLC v. Gupta*, 126 USPQ2d 1601, 1606 (TTAB 2018).

3959457 (2011) JAVA MONSTER (JAVA disclaimed) energy drinks

4030735 (2011) MONSTER ENERGY EXTRA STRENGTH NITROUS TECHNOLOGY (ENERGY EXTRA STRENGTH NITROUS TECHNOLOGY disclaimed) nutritional supplements and energy drinks

4036681 (2011) MONSTER ENERGY (ENERGY disclaimed) energy drinks

4111964 (2012) MONSTER REHAB ready to drink tea and tea-based beverages

4129288 (2012) MONSTER REHAB energy drinks, shelf stable fruit juice drinks

4234456 (2012) UBERMONSTER nutritional supplements and energy drinks

4376796 (2013) MUSCLE MONSTER nutritional supplements and energy drinks

4451535 (2013) MUSCLE MONSTER vitamin-fortified beverages and energy shakes and ready to drink coffee-based and chocolate-based beverages

4532292 (2014) MONSTER ENERGY ULTRA RED (ENERGY and RED disclaimed) nutritional supplements and energy drinks

4534414 (2014) MONSTER ENERGY ULTRA BLUE (ENERGY and BLUE disclaimed) nutritional supplements and energy drinks

4634053 (2014) MONSTER ASSAULT nutritional supplements and energy drinks flavored with juice

5114853 (2017)  restaurant services; bar services

5114854 (2017) MONSTER ENERGY restaurant services; bar services

2. **Testimony**

- Testimony Declaration of Opposer's Chief Executive Officer Rodney Sacks and exhibits;[6]

---

[6] 67 TTABVUE (declaration and exhibits 1-18), 68 TTABVUE (exhibits 19-40), 69-70 (3, 12, 20 confidential exhibits).

- Testimony Declaration of Norman Broadhurst, Opposer's marketing expert and President of Channel Marketing Resources, Inc., a marketing company specializing in food and beverages, and exhibits;[7]
- Testimony Declaration of Opposer's investigator Michael Santoni and exhibits;[8] and
- Trial cross-examination deposition transcript of FnB Gourmet Group Director Betty Hung and exhibits.[9]

3. **Notices of reliance**

- Printouts of webpages showing Opposer's Securities and Exchange Commission (SEC) filings for 2002-2018;[10]
- Printouts of webpages from Opposer's website and Facebook, Instagram, Twitter, and YouTube accounts;[11]
- Printouts of websites from third party webpages and social media accounts;[12]
- Pages from printed publications featuring Opposer or its predecessor, namely a newspaper article from the Wall Street Journal (2003); articles from general business publications, namely Fortune (2005, 2006, 2007), Forbes (2005, 2008), BusinessWeek (2006), and articles from trade journals, namely Beverage Aisle (2002, 2003), CSP (formerly Convenience Store Products) (2003), and Beverage Industry (June and October 2004, 2007, 2009).[13]
- Applicant's initial disclosures and discovery responses;[14]
- Applicant's cancelled Registration Nos. 2960145 and 2989980, both for ICE MONSTER and non-Latin characters, and underlying application files;[15]
- Printouts from Applicant's Facebook pages;[16]

---

[7] 64 and 65 TTABVUE.

[8] 63 TTABVUE (Ex. 24-26) and 66 TTABVUE (declaration and exhibits 1-23).

[9] 111 TTABVUE. FnB Gourmet Group is the business owned by Applicant, a citizen of Taiwan, through which he offers the services under the mark. Betty Hung is Applicant's spouse and business partner. 97 TTABVUE 2.

[10] 71 TTABVUE 8-14;190-445; 72 TTABVUE 2-1498.

[11] 74 TTABVUE 18-51; 58-143; 146-151; 75 TTABVUE 1-88; 76 TTABVUE 2-65; 104 TTABVUE 11-25; 105 TTABVUE.

[12] 74 TTABVUE 52-57, 144-145; 76 TTABVUE 66-77; 104 TTABVUE 26.

[13] 73 TTABVUE.

[14] 71 TTABVUE 99-189.

[15] 105 TTABVUE 41-217.

[16] 104 TTABVUE 26-69; 105 TTABVUE 2-40.

- Excerpts from the discovery deposition of Director Hung and exhibits;[17]

## B. Applicant's Evidence[18]

### 1. Testimony

- Declaration of Director Hung and exhibits;[19]
- Cross-examination deposition transcript of CEO Sacks and exhibits[20]
- Cross-examination deposition transcript of Norman Broadhurst and exhibits;[21] and
- Cross-examination deposition transcript of Michael Santoni and exhibits.[22]

### 2. Notices of reliance

- Various papers from the application file for pleaded Registration No. 5114854;[23] and
- Applicant's certificate of registration and excerpts from the underlying application file for Registration No. 5971045 for a design mark.[24]

---

[17] 106 TTABVUE.

[18] We do not list duplicative submissions of matter already of record such as the pleadings and the subject application.

During trial, in contravention of Trademark Rule 2.120(f), 37 CFR § 2.120(f), Applicant submitted the discovery deposition transcript of his own witness Director Hung (96 TTABVUE). Opposer moved to strike the deposition transcript (101 TTABVUE), and Applicant withdrew it (103 TTABVUE). The Board noted the withdrawal and denied the motion to strike as moot (108 TTABVUE).

In his brief, Applicant cites as evidence (117 TTABVUE 7-8, 18, 27, 34, 37-38, and 43) Director Hung's discovery deposition transcript that Applicant withdrew. Opposer's rebuttal brief (119 TTABVUE 7) points out Applicant's improper citation to the withdrawn evidence. Because Applicant withdrew this evidence, his arguments regarding the withdrawn evidence, and the withdrawn evidence itself, are given no consideration.

[19] 97 TTABVUE.

[20] 93 TTABVUE.

[21] 94 TTABVUE.

[22] 95 TTABVUE.

[23] 98 TTABVUE 5-12.

[24] 98 TTABVUE 13-22.

**II. APPLICANT'S MOTION TO AMEND HIS APPLICATION**

Concurrently with the filing of his trial brief, Applicant moved to amend his application to restrict his services, contingent upon the Board ruling against Applicant on the likelihood of confusion claim with respect to the broader identification of services published for opposition.[25] The proposed amendment would narrow the identification of services from:[26]

restaurants, coffee shops, ices parlors, snack bars with take-out for flavored and fruit ice products, and specifically excluding frozen yogurt

to:

ices parlors with take-out for ice products made with fresh fruit, fresh fruit toppings, and fresh fruit juices, and specifically excluding frozen yogurt, alcoholic beverages, and alcoholic drinks bar services, energy drinks.

Applicant moves for entry of the amendment "in the event the panel finds likelihood of confusion with regard to [Applicant's] application for registration of ICE MONSTER for services," because the effect "would be to limit [Applicant's] registration to services focused only on ice treats and eliminating the incidental restaurant services currently included."[27] In its reply brief, Opposer contends it had

---

[25] 118 TTABVUE.

[26] 118 TTABVUE 3.

[27] 117 TTABVUE 54-55. Applicant's statement (118 TTABVUE 3) that "Applicant is also open to considering any additional amendments the TTAB Panel or Opposer may suggest" is made in vain. Although an Examining Attorney in ex parte examination may have occasion to suggest amendments to an application which would put it in condition for approval, in an inter partes proceeding, the Board does not make such suggestions; the Board maintains its neutrality and decides only the pleaded claims and defenses presented to it.

no notice of the proposed amendment, and "Applicant had never raised the issue of a possible restriction to his identification of services."[28]

Trademark Rule 2.133(a), 37 CFR 2.133(a), provides that "[a]n application subject to an opposition may not be amended in substance … except with the consent of the other party or parties and the approval of the Trademark Trial and Appeal Board, or upon motion granted by the Board." In the absence of consent, a motion to amend an application "should be made prior to trial to give the opposer fair notice." *City of London Distillery, Ltd. v. Hayman Grp. Ltd.*, 2020 USPQ2d 11487, at \*12 (TTAB 2020). "That is to say, the Board will exercise its discretion under Trademark Rule 2.133(b) only where the … opposer has been put on notice during the trial period that the Board will be considering the issue of confusion with respect to a recitation of goods or services narrower in scope than that which was shown in the … application at the commencement of the proceeding." *Personnel Data Sys., Inc. v. Parameter Driven Software*, Inc., 20 USPQ2d 1863, 1865 (TTAB 1991).

Applicant has known since the Board granted Opposer's motion to amend the notice of opposition to plead particular registrations that Opposer was asserting its registrations for restaurant services, and Applicant could have sought to amend his recitation of services well before trial. Opposer would then have been able to seek discovery, and to submit evidence and argument regarding the likelihood of confusion of Applicant's mark for the amended services. However, now the trial is over, and Opposer submitted its brief arguing why its evidence shows a likelihood of confusion

---

[28] 119 TTABVUE 18.

between its MONSTER ENERGY marks for the registered restaurant services and

the [ICE MONSTER] mark for the restaurant services described in the application. To allow Applicant to delete "restaurant" services from the application at this late date is unfair to Opposer. *See City of London Distillery*, 2020 USPQ2d 11487, at \*12.[29]

Applicant, in his brief, describes the proposed amended services as also excluding "the service of sandwiches, hamburgers, hot dogs, cereals, meats, fish, poultry, or full-course meals." 117 TTABVUE 55 n. 50. This proposed restriction differs from the proposed restriction in the motion to amend. The uncertainty as to the exact amendment requested is a separate basis for denial. *See ProQuest Info. and Learning Co. v. Island*, 83 USPQ2d 1351, 1353-54 (TTAB 2007) ("the possible restriction [must be] stated with precision such that the issue is properly framed for trial").[30]

Applicant's motion for prospective amendment of his application to restrict his services is denied.

---

[29] The denial of Applicant's motion to amend is not a finding that the proposed amendment, if entered, would preclude the services being found identical. Rather, it is too late to address the new issue of whether Opposer's unrestricted "restaurant services" encompass Applicant's proposed services "ices parlors with take-out for ice products made with fresh fruit, fresh fruit toppings, and fresh fruit juices, and specifically excluding frozen yogurt, alcoholic beverages, and alcoholic drinks bar services, energy drinks."

[30] In fact, a timely amendment to an opposed application filed without the consent of the opposer must satisfy additional circumstances: 1) the proposed amendment serves to limit the broader identification of goods or services; 2) applicant consents to the entry of judgment with respect to the broader identification of goods or services present at publication; 3) any specimens of record support the goods or services as amended; and 4) if the applicant wishes to avoid the possibility of a res judicata effect by the entry of judgment on the original identification, the applicant must make a prima facie showing that the proposed amendment serves to change the nature and character of the goods or services or restrict their channels of trade and customers so as to introduce a substantially different issue for trial. *See Johnson & Johnson v. Stryker Corp.*, 109 USPQ2d 1077, 1078-79 (TTAB 2013).

### III. ENTITLEMENT TO A STATUTORY CAUSE OF ACTION

Entitlement to a statutory cause of action is a requirement in every inter partes case.[31] *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837 at *3 (Fed. Cir. 2020) (*citing Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 125-26 (2014)) , *cert. denied*, 142 S. Ct. 82 (2021). A party in the position of plaintiff may oppose registration of a mark when doing so is within the zone of interests protected by the statute and it has a reasonable belief in damage that would be proximately caused by registration of the mark. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at * 6-7 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2671 (2021).

Opposer introduced copies of its pleaded registrations showing their active status and Opposer's ownership.[32] The pleaded registrations establish Opposer's direct commercial interest in the proceeding that entitles it to bring a statutory cause of action, namely, to oppose registration of Applicant's mark on the ground of priority and likelihood of confusion. *See Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1377 (Fed. Cir. 2002) ("In most settings, a direct commercial interest satisfies the 'real interest' test"); *Cunningham v. Laser Golf Corp.*, 222 F.3d

---

[31] Our decisions have previously analyzed the requirements of Sections 13 and 14 of the Trademark Act, 15 U.S.C. §§ 1063-64, under the rubric of "standing." We now refer to this inquiry as entitlement to a statutory cause of action. Despite the change in nomenclature, our prior decisions and those of the Federal Circuit interpreting Sections 13 and 14 remain equally applicable. *Spanishtown Enters., Inc. v. Transcend Res., Inc.*, 2020 USPQ2d 11388 at *2 (TTAB 2020).

[32] 14 TTABVUE 26-135.

943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000) (pleaded registrations "suffice to establish ... direct commercial interest").

In addition, Opposer's CEO Rodney Sacks declared that Opposer has used the mark MONSTER ENERGY in connection with restaurant services since 2016.[33] *See Fallon v. Brown Innovation, LLC*, 2021 USPQ2d 5196463 at *4-5 (TTAB 2021) ("Based on such common law use through its licensee, Opposer has asserted a plausible likelihood of confusion claim against the involved application, thereby showing a real interest in this proceeding beyond that of a mere intermeddler, and a reasonable basis for his belief of damage.").[34]

## IV. LIKELIHOOD OF CONFUSION

Under Section 2(d) of the Trademark Act, a mark may not be registered if it "consists of or comprises a mark … or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion…." We focus our analysis on the standard characters mark MONSTER ENERGY in Opposer's pleaded Registration No. 5114854 for "Restaurant services; bar services" (the '854 Registration"), which of the pleaded registrations has the most points in common with

Applicant's mark . *See Sock It To Me, Inc. v. Aiping Fan*, 2020 USPQ2d 10611, at *6 (TTAB 2020) (confining likelihood of confusion analysis to most

---

[33] 67 TTABVUE 7.

[34] Applicant, in his brief, did not challenge Opposer's entitlement to a statutory cause of action.

similar pleaded mark). Because, as explained more fully below, we find that there is a likelihood of confusion between the mark in this registration and Applicant's mark for "restaurants, coffee shops, ices parlors, snack bars with take-out for flavored and fruit ice products, and specifically excluding frozen yogurt," there is no need for us to consider the likelihood of confusion with Opposer's other pleaded registrations and marks.

### A. Priority

Because Opposer's pleaded Registration No. 5114854 is of record, and Applicant's counterclaim has been dismissed, priority is not at issue with respect to this mark and the services identified in the associated registration. *Mini Melts, Inc. v. Reckitt Benckiser LLC*, 118 USPQ2d 1464, 1469 (TTAB 2016) (*citing King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974)).

### B. Likelihood of Confusion

Our determination under Trademark Act Section 2(d) is based on an analysis of all probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. DuPont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) (enumerating thirteen factors to be considered when testing for likelihood of confusion). "Whether a likelihood of confusion exists between an applicant's mark and a previously registered mark is determined on a case-by-case basis, aided by application of the thirteen *DuPont* factors." *Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 128 USPQ2d 1686, 1689 (Fed. Cir. 2018).

In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."). Those factors largely are determinative here. Nevertheless, we must consider each relevant *DuPont* factor for which there are arguments and evidence. *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1800 (Fed. Cir. 2018) ("Not all of the *DuPont* factors are relevant to every case, and only factors of significance to the particular mark need be considered.") (*quoting In re Mighty Leaf Tea*, 601 F.3d 1342, 94 USPQ2d 1257, 1259 (Fed. Cir. 2010)).

1. **Similarity or Dissimilarity of the Parties' Services, Trade Channels, and Conditions of Purchase**

We now address the second, third, and fourth *DuPont* factors, assessing the similarity or dissimilarity of the parties' services, trade channels, and "the conditions under which and buyers to whom sales are made, i.e. 'impulse' vs. careful, sophisticated purchasing.'" *DuPont,* 177 USPQ at 567. Our determination must be based on the recitations of services in the pleaded registration and subject application because they define the scope of the benefit of registration. *Stone Lion Capital Partners, LP v. Lion Capital LLP,* 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014). The application and registration themselves may provide evidence of the relationship between the services. *Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1310 (Fed. Cir. 2002) ("On the face of the registrations

themselves, QSC's [amplifiers and power amplifiers] and the ACOUSTIC WAVE [loudspeaker systems and music systems consisting of a loudspeaker system and amplifier and at least one of a radio tuner, compact disc player and audio tape cassette player and loudspeaker systems] are related."); *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1005 (Fed. Cir. 2002) (finding the Board erred in concluding that there was insufficient evidence of relatedness, because it "did not consider the important evidence already before it, namely the ITU application and [opposer's] registrations").

Applicant's services are "restaurants, coffee shops, ices parlors, snack bars with take-out for flavored and fruit ice products, and specifically excluding frozen yogurt," and we read this as "restaurants, coffee shops, ices parlors, snack bars" each having "take-out for flavored and fruit ice products, and specifically excluding frozen yogurt."[35] Opposer's services include unrestricted "Restaurant services," which include restaurants with take-out for flavored and fruit ice products. If an application or registration describes goods or services broadly, and there is no limitation as to their nature, it is presumed that the "registration encompasses all goods or services of the type described." *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719

---

[35] Because Applicant's different venues are not separated by a semicolon, they each are subject to the limiting language in the recitation. "Under standard examination practice, a semicolon is used to separate distinct categories of goods or services." *In re Midwest Gaming & Entm't LLC*, 106 USPQ2d 1163, 1166 (TTAB 2013) (citing Trademark Manual of Examining Procedure (TMEP) §1402.01(a) (2012)). The current version of the TMEP explains "commas should be used in the identification to separate items within a particular category of goods or services" and semicolons "should generally be used to separate distinct categories of goods or services within a single class." TMEP §1402.01(a) (July 2021). Even if we did not read each venue as subject to the restriction, Applicant's services would overlap with Opposer's "restaurant services."

F.3d 1367, 1373, 107 USPQ2d 1167, 1173 (Fed. Cir. 2013) quoting TMEP §1207.01(a)(iii); *Anthony's Pizza & Pasta Int'l Inc. v. Anthony's Pizza Holding Co.*, 95 USPQ2d 1271, 1278-79 (TTAB 2009) ("The services are legally identical. Defendant has registered its mark and is seeking to register its word and design marks for 'restaurant services, namely, eat-in and take-out coal oven pizza and other items' and plaintiff has registered its marks for restaurant services."); *Jansen Enters. Inc. v. Rind,* 85 USPQ2d 1104, 1108 (TTAB 2007) (petitioner's "restaurant services" encompass respondent's "restaurant services featuring bagels as a main entrée"). Accordingly, we find that Applicant's services are legally identical in part to the restaurant services listed in the pleaded registration.[36]

Applicant disputes that the services are identical. More specifically, Applicant presents evidence that the marks are used on restaurant services which do not overlap because "the focus of [Applicant's] restaurant business is gourmet ices," and Opposer "uses its cafeteria mostly to feed its employees."[37] Applicant's argument is not persuasive. The Court of Appeals for the Federal Circuit stated "the authority is legion" that whether a likelihood of confusion with a registered mark bars an applicant's mark "must be decided on the basis of the identification of goods set forth

---

[36] There is no need to establish a likelihood of confusion as to each distinct service; likely confusion as to even one service recited in the application is sufficient for the purposes of establishing a likelihood of confusion. *See Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981) ("[L]ikelihood of confusion must be found if the public, being familiar with appellee's use of MONOPOLY for board games and seeing the mark on any item that comes within the description of goods set forth by appellant in its application, is likely to believe that appellee has expanded its use of the mark, directly or under a license, for such item.").

[37] 117 TTABVUE 29, 38.

in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which the sales of goods are directed." *Octocom Sys., Inc. v. Hous. Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990). As stated above, we must consider Opposer's registered restaurant services as broad enough to encompass all restaurants, not merely employee cafeterias, and this includes "restaurants … with take-out for flavored and fruit ice products, and specifically excluding frozen yogurt," or as Applicant phrases it, restaurants serving gourmet ices. Therefore, we must treat the parties' restaurant services as legally identical.

Because the services described in the application and the pleaded registration are legally identical in part, we must presume that the channels of trade and classes of purchasers are the same as to those legally identical services. *See In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (identical goods or services are presumed to travel in same channels of trade to same class of purchasers) (cited in *Cai v. Diamond Hong, Inc.,* 901 F.3d 1367, 127 USPQ2d 1797, 1801 (Fed. Cir. 2018) ("With respect to similarity of the established trade channels through which the goods reach customers, the TTAB properly followed our case law and 'presume[d] that the identical goods move in the same channels of trade and are available to the same classes of customers for such goods….'")*; Am. Lebanese Syrian Associated Charities Inc. v. Child Health Research Inst.*, 101 USPQ2d 1022, 1028 (TTAB 2011) (for legally identical services, marketing channels of trade and targeted classes of consumers are

the same). We find that the class of consumers for the presumptively identical restaurant services of both parties is the general public.

As with our analysis of the similarity or dissimilarity of the services, trade channels, and classes of customers, we assess similarities in the conditions of sale based on the recitation of services in the application and pleaded registration. *See Stone Lion,* 110 USPQ2d at 1161-62. We consider the specific services encompassed by Opposer's recitation of services which overlap with Applicant's recitation of services, namely "restaurants, coffee shops, ices parlors, snack bars with take-out for flavored and fruit ice products, and specifically excluding frozen yogurt."

Applicant does not dispute that his identified take-out restaurant services featuring ice products, and those same services which we must presume to be encompassed by Opposer's registration, are on the less formal and expensive spectrum of restaurants. Opposer has submitted evidence demonstrating that that the average purchase by a customer of Applicant's services is about $12-15.[38] "When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care." *Recot, Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1899 (Fed. Cir. 2000). *Accord Hard Rock Café Licensing Corp. v. Elsea*, 48 USPQ2d 1400, 1407 (TTAB 1998) ("While ordinary consumers can be said to choose their restaurants with a certain degree of care based on their own experience and the recommendations of others, we do not find this fact to warrant the conclusion, with

---

[38] 112 TTABVUE 48, citing 71 TTABVUE 105.

respect to likelihood of confusion, that consumers exercise a high degree of discrimination or sophistication with regard to their decision to patronize certain eating establishments.").

We find *DuPont* factors two, three and four weigh in favor of finding a likelihood of confusion.

2. **Strength of Opposer's Registered MONSTER ENERGY Mark**

To ascertain the scope of protection to which it is entitled, we consider the strength of Opposer's mark. *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015) ("The weaker an opposer's mark, the closer an applicant's mark can come without causing a likelihood of confusion and thereby invading what amounts to its comparatively narrower range of protection."); *Bose Corp.,* 63 USPQ2d at 1309 ("[the marks ACOUSTIC WAVE and WAVE] are famous and thus entitled to broad protection"). A mark can be conceptually strong and/or commercially strong. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength … and its marketplace strength …."). The fifth *DuPont* factor enables Opposer to prove that its pleaded mark is entitled to an expanded scope of protection by adducing evidence of "[t]he fame of the prior mark (sales, advertising, length of use);"[39] the sixth *DuPont* factor allows Applicant to contract that scope of protection

---

[39] While *DuPont* factor five specifies the "fame" of the mark, the Court of Appeals for the Federal Circuit also considers the "strength" of the mark under that factor. *See Stone Lion* 110 USPQ2d at 1160 ("the Board found factor five—the strength of Lion's marks—was neutral because Lion failed to show "that its marks are well-known in the financial services field."); *Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1458 (Fed Cir. 1992) ("Famous or strong marks enjoy a wide latitude of legal protection.").

by adducing evidence of "[t]he number and nature of similar marks in use on similar goods." *Sock It To Me, Inc. v. Aiping* Fan, 2020 USPQ2d 10611, at \*8 (quoting *DuPont*, 177 USPQ at 567).

With respect to its conceptual strength, Opposer's pleaded mark MONSTER ENERGY is registered on the Principal Register without a claim of acquired distinctiveness and so is treated as inherently distinctive. [40] *See New Era Cap Co., Inc. v. Pro Era, LLC*, 2020 USPQ2d 10596, at \*10 (TTAB 2020) ("Opposer's mark is inherently distinctive as evidenced by its registration on the Principal Register without a claim of acquired distinctiveness under Section 2(f) of the Trademark Act."). The term MONSTER is defined as both the noun "an animal of strange or terrifying shape" and the adjective "enormous or impressive especially in size, extent, or numbers."[41] On their face, both definitions of MONSTER have a hyberbolic connotation, and denote the unusual.[42] In contrast, the noun "ENERGY" is defined

---

*See also Kimberly-Clark Corp. v. H. Douglas Enterprises, Ltd.*, 774 F.2d 1144, 227 USPQ 541, 542 n. 6 (Fed. Cir. 1985) ("Appellee quibbles that in the TTAB proceeding K-C did not explicitly say that its mark had acquired "fame," but there is no doubt that appellant presented much evidence on, and strongly urged, the "extensive reputation," "well-known," "distinctive," etc. characteristic of its mark HUGGIES.").

[40] Applicant erroneously contends (117 TTABVUE 16-30) that the MONSTER ENERGY mark is not distinctive. We address those contentions only as they affect the degree of protection to be accorded the inherently distinctive mark.

[41] Merriam-Webster, https://www.merriam-webster.com/dictionary/monster. Accessed May 12, 2022. The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format or have regular fixed editions. *In re Cordua Rests. LP*, 110 USPQ2d 1227, 1229 n.4 (TTAB 2014), *aff'd*, 823 F.3d 594, 118 USPQ2d 1632 (Fed. Cir. 2016).

[42] Because it ignores the element of exaggeration in the definition of the term, we disagree with Applicant's argument (117 TTABVUE 117-121) that the term MONSTER in MONSTER ENERGY merely denotes "large," and so is descriptive of the size of the goods. While not determinative on the question, we note that neither party has been required to disclaim the term for registration, the practice with separable non-distinctive elements of a mark. *See*

as "usable power (such as heat or electricity),"[43] and lacks the strange, terrifying, enormous or impressive qualities of the other term.

Considering the mark MONSTER ENERGY as a whole, we find that the hyperbolic quality of the term MONSTER makes it the dominant term in the mark. In addition, the first term generally is the one which creates the strongest impression. *See In re Detroit Athletic Co.*, 903 F3d 1297, 128 USPQ2d 1047, 1049 (Fed. Cir. 2018) ("The identity of the marks' initial two words is particularly significant because consumers typically notice those words first."); *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005) ("Veuve" is the most prominent part of the mark VEUVE CLICQUOT because "veuve" is the first word in the mark).

We find Opposer's mark MONSTER ENERGY as applied to restaurant services suggests either a monster of energy or an energetic monster, but in either case the combined term is arbitrary and hence conceptually strong as applied to restaurant services. *See Palm Bay,* 73 USPQ2d at 1692 (an arbitrary term is "conceptually strong as a trademark"); *Nautilus Grp., Inc. v. Icon Health & Fitness, Inc.*, 372 F.3d 1330, 71 USPQ2d 1173, 1180 (Fed. Cir. 2004) (an arbitrary mark is a "known word used in an unexpected or uncommon way").

---

Trademark Act Section 6(a), 15 U.S.C.1056(a) ("The Director may require the applicant to disclaim an unregistrable component of a mark otherwise registrable.").

[43] Merriam-Webster, https://www.merriam-webster.com/dictionary/energy. Accessed May 12, 2022.

With respect to its commercial strength under the fifth *DuPont* factor, the fame of the prior mark, we must determine where to place Opposer's mark on the "spectrum" of marks, which ranges from "very strong to very weak." *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017) (*quoting In re Coors Brewing Co.*, 343 F.3d 1340,68 USPQ2d 1059, 1063 (Fed. Cir. 2003)). Fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection or exclusivity of use. *Bose Corp.*, 63 USPQ2d at 1305. In particular, we must assess whether Opposer's MONSTER ENERGY mark as applied to restaurant services is so commercially strong as to be famous.

Fame for confusion purposes arises as long as a significant portion of the relevant consuming public recognizes the mark as a source indicator. *Palm Bay,* 73 USPQ2d at 1694. Commercial strength may be measured indirectly "by the volume of sales and advertising expenditures in connection with the goods sold under the marks, for example, and other factors such as length of time of use of the mark; widespread critical assessments; notice by independent sources of the products identified by the marks; and the general reputation of the products and services."[44] *Weider Publ'ns, LLC v. D & D Beauty Care Co.*, 109 USPQ2d 1347, 1354 (TTAB 2014); *see also Bose*

---

[44] Fame for likelihood of confusion purposes also may be measured directly by consumer survey. *Omaha Steaks,* 128 USPQ2d at 1689. However, this is not required and seldom utilized. *Id.* at 1690, *citing Bose Corp.,* 63 USPQ2d at 1305 ("Direct evidence of fame, for example from widespread consumer polls, rarely appears in contests over likelihood of confusion.").

*Corp.,* 63 USPQ2d at 1308 (recognizing indirect evidence as appropriate proof of strength).

Here, Opposer's argument for the strength of its mark as applied to restaurant services is based on the argument that the MONSTER ENERGY mark is famous.[45] However, Opposer's evidence of fame relates to its energy drinks and not its restaurant services. The declaration by Opposer's CEO Sacks shows Opposer uses the terms MONSTER or MONSTER ENERGY on all of its energy drinks and has done so since introducing its energy drinks in 2002.[46] Opposer promotes the MONSTER ENERGY mark through sponsorships of entertainment and competitive events such as concerts, motorcycle (supercross and motorcross) and car (rally car, NASCAR stock car, and Formula One) races, UFC mixed martial arts, and the extreme sports X Games, as well as competing teams and individual athletes; and each event, team, or athlete displays the MONSTER ENERGY mark before hundreds of thousands of attendees, and, when nationally televised on network and sports channels, also reaches millions of viewers.[47] Opposer maintains two websites and a strong social

---

[45] 112 TTABVUE 14-26.

[46] 67 TTABVUE 3.

[47] 67 TTABVUE 6-7, 10-13. We find Opposer's contention (112 TTABVUE 38) that its MONSTER ENERGY mark is the subject of "significant" media exposure unconvincing. Eight of the fifteen articles submitted appear in trade publications not widely available to the general public (Beverage Aisle, CSP [formerly Convenience Store Products], and Beverage Industry) (73 TTABVUE 57-64, 66-70, 72-75, 77-78, 80-81, 83-84, 86-87, and 89-90) and four articles target investors rather than the general public, and relate to the growth or stock value of Opposer, with only a single passing reference to Opposer's product MONSTER ENERGY energy drinks (73 TTABVUE 15-16, 18-19, 21-36, and 41-52). One article refers to "Hansen Naturals," presumably a division of Opposer's predecessor Hansen Beverage Company, and the term MONSTER ENERGY does not appear in the article at all. 73 TTABVUE 8-13. Moreover, because the most recent single article (dated 2009) is more than

media presence advertising its energy drinks and the events it sponsors.[48] Opposer devotes significant sums (amounts submitted under seal) to promote its MONSTER ENERGY drinks; had more than $1 billion in gross sales of energy drinks bearing the marks MONSTER ENERGY or MONSTER in the United States each year from 2011 to 2016; has sold its energy drinks in more than 300,000 retail outlets in the United States; and Opposer's MONSTER and MONSTER ENERGY drinks are the best-selling energy drink in the United States.[49]

While arguing strenuously that the fame does not extend beyond those goods, Applicant does not dispute that the mark MONSTER ENERGY is famous for energy drinks.[50] *Swatch AG v. M. Z. Berger & Co.*, 108 USPQ2d 1463, 1469 (TTAB 2013) ("Nor does applicant dispute the extensive evidence of fame of the SWATCH mark introduced by opposer, which we find to be sufficient to prove that the mark is famous for purposes of the likelihood of confusion analysis."). This fact, in combination with the record evidence of almost twenty years of use of the MONSTER ENERGY and MONSTER marks for energy drinks, Opposer's web presence through its website and social media, significant advertising expenditures in connection with the energy

---

a decade old, and eight are dated 2005 or earlier, this evidence does not demonstrate the current public perception of the mark.

[48] 67 TTABVUE 14-16 (declaration), 68 TTABVUE 1-172 (excerpts from Opposer's websites and social media accounts).

[49] 67 TTABVUE 4-6.

[50] Applicant's brief states: "If [Opposer] claims a common benefit from its famous Drink Marks, then it must also accept their common limitations;" "That particular field of 'energy drinks' supports [Opposer]'s claim to fame;" "Clearly, [Opposer]'s strongest 'zone of fame' is in the field of caffeinated energy drinks;" and "[Opposer]'s marks have a level of fame in the caffeinated drink world, but [Opposer] has restricted itself from the types of products that [Applicant] sells." 117 TTABVUE 12, 13, 23, 32.

drinks sold under the marks, and Opposer's substantial energy drink market share, demonstrates that a significant portion of the relevant consuming public for energy drinks recognizes the MONSTER ENERGY mark as a source indicator for energy drinks. We find that, for likelihood of confusion purposes, the mark MONSTER ENERGY is famous for energy drinks. *See Bose Corp.*, 63 USPQ2d at 1306 ("we have consistently accepted statistics of sales and advertising as indicia of fame: when the numbers are large, we have tended to accept them without any further supporting proof.").

Turning to the commercial strength of Opposer's MONSTER ENERGY mark in connection with restaurant services, we find Opposer's use has not resulted in any notable commercial strength of the mark in connection with these services. Opposer has one restaurant, Monster Beastro Café, operating since 2016, which is in-house for Opposer's employees and visitors to the building only.[51] While Opposer submitted confidential data on gross sales at the restaurant, those numbers are minor. Little more is known about the restaurant.[52] Opposer provides no information on promotion of the restaurant or how many non-employee visitors receive the restaurant services.

---

[51] 67 TTABVUE 8, 93 TTABVUE 123-126. Opposer's in-house restaurant is located in its headquarters building, and visitors must give information to building security before they can enter. 93 TTABVUE 126. Opposer also has a food truck with the same name, but did not provide information such as how long the food truck has operated, or where, or whether the food truck is available to the general public. 67 TTABVUE 8, 93 TTABVUE 125.

[52] *Id.*

We have no basis for finding MONSTER ENERGY to be a commercially strong mark for restaurants.[53]

In its reply brief, Opposer contends the evidence shows the fame of the MONSTER ENERGY mark is not limited to energy drinks, but the mark is famous "among the general public."[54] Because a mark is a source indicator for specific goods or services, Opposer's assertion is incomplete without specifying for what goods or services the mark is famous. Opposer does not so specify, but cites social media excerpts in the record which feature photos of the MONSTER ENERGY mark when it is not affixed to an energy drink, such as banners at a sporting event sponsored by Opposer.[55] CEO Sacks' declaration makes clear that such uses of the mark at sponsored events promote Opposer's energy drinks, averring "The MONSTER line of drinks are the

---

[53] On cross-examination, Mr. Sacks made clear that the MONSTER ENERGY hospitality areas at events sponsored by Opposer serve to promote Opposer's energy drinks, and not its restaurant services (93 TTABVUE 131-132):

Q. And the catering -- or these catered events, do they make money for Monster Energy?
A. Well, we make money because we get supporters there that buy our products. I may not charge, you know, an actual fee for every sandwich that I have or everything that they take, but -- that, we don't do. But the fact is that this is our -- this is the way we spend our money and our marketing to engage the consumer and bring them closer to the whole brand and everything.
Q. So it's promotional?
A. Yeah, very much so promotional. But it's also to, you know, engage them again. So we supply the food and drinks, and they then are there and enjoy themselves, and that's just part of the experience.

[54] 119 TTABVUE 15-16.

[55] *Id.* Opposer also cites the record articles about the MONSTER ENERGY mark in national publications not related to the beverage industry. 119 TTABVUE 15. In addition to deficiencies of those articles discussed earlier in this decision, to the extent that the articles refer to MONSTER ENERGY as Opposer's mark rather than its name, the articles refer to MONSTER ENERGY as Opposer's mark for energy drinks.

subject of substantial and continuous advertising, marketing and promotion in the United States and throughout the world."[56] CEO Sacks also averred that "The [Facebook] page features Monster's beverages and Monster-sponsored athletes, sports, and events, from all over the world and prominently displays the MONSTER Marks." 67 TTABVUE 14.[57] In short, we disagree that the evidence of record shows that the MONSTER ENERGY mark is famous for more than energy drinks.

However, to assess whether the strength of Opposer's MONSTER ENERGY mark for energy drinks would impart strength to its mark when used for restaurant services, we also have considered Opposer's evidence in support of its argument that consumers would perceive restaurant services, or flavored and fruit ice products and beverages as emanating from a single source.[58] As discussed below, because the distinction is commercially significant, we reject Opposer's broader framing of the issue as whether consumers perceive restaurant services, "frozen confections," and "beverages" as emanating from a single source.

In support of the argument that its energy drinks are closely related to the flavored and fruit ice products offered at Applicant's restaurants, Opposer submitted the declaration of marketing expert Norman Broadhurst concluding, after his review of webpages and online publications, that beverage product companies and retail

---

[56] 67 TTABVUE 5.

[57] 119 TTABVUE 15-16.

[58] 112 TTABVUE 44-46. That is, even though the evidence was submitted to show the relationship between energy drinks and restaurant services, an issue we need not reach in view of our decision to focus on likelihood of confusion with Opposer's registration for in part identical services, we will assess whether the evidence shows the strength of the MONSTER ENERGY mark reaches beyond energy drinks to restaurant services.

eating establishments commonly extend their respective brands into multiple products, including frozen confectionary products.[59] We give little probative weight to this evidence because the opinion is not based on commercial practices with respect to energy drinks, but the more general category of beverages. With the one exception of the exhibits advertising Starbucks Doubleshot Energy coffee drinks (64 TTABVUE 15-16, 65 TTABVUE 53-57), the exhibits attached to the Broadhurst declaration show non-energy drinks such as soft drinks (A&W, Crush, Dr. Pepper, Sunkist), fruit and tea drinks (Snapple), fruit punch drinks (Hawaiian Punch), and fruit juices (Juicy Juice, Minute Maid, Mott's, Welch's).

At one unspecified point in time, Opposer had a temporary arrangement with 7-Eleven stores to offer a Monster Black Ice Slurpee, a frozen drink "intended to be a more limited time product."[60] While a frozen drink is related to flavored and fruit ice products, the record includes few details about the arrangement, such as how long it lasted.

Opposer's investigator Michael Santoni took pictures of 26 take-out restaurants offering both MONSTER ENERGY energy drinks and cold or frozen items (such as smoothies, milkshakes and ice cream), not limited to the flavored and fruit ice

---

[59] 112 TTABVUE 45 citing 64-65 TTABVUE. Mr. Broadhurst was asked to provide an opinion on "(1) whether companies that sell beverages, including, for example coffee, tea, energy drinks, and soft drinks among other products also sell flavored and fruit ice products and other frozen novelty confectionary products under the same brand; and (2) whether consumers commonly associate these products as originating from a common source." 64 TTABVUE 5.

[60] 93 TTABVUE 83-84.

products offered by Applicant's restaurant services.[61] When narrowed to comparable ice products like shaved ice and snow cones (defined as granular ice molded into a ball and flavored with a syrup[62]), Opposer's evidence shows seven take out restaurants offering both MONSTER ENERGY drinks and flavored and fruit ice products.[63] The evidence from the seven restaurants does not show that ice products and MONSTER ENERGY drinks are similar menu items. The photos of the take-out restaurants show a counter where the ice products are prepared and a separate refrigerator case with a variety of packaged cold drinks, including MONSTER ENERGY drinks. While we acknowledge the evidence that a takeout restaurant offering ice products may also offer MONSTER ENERGY drinks, the evidence Opposer made of record on that issue is limited.

After consideration of the evidence regarding the relationship between energy drinks and restaurants and frozen and flavored ice products, we find that the fame of the MONSTER ENERGY energy drinks does not extend to restaurant services generally or to restaurants with take-out for flavored and fruit ice products.[64]

---

[61] 63 (Ex. 24-26) and 66 (declaration and exhibits 1-23) TTABVUE.

[62] Merriam-Webster, https://www.merriam-webster.com/dictionary/snow%20cone. Accessed May 12, 2022.

[63] 63 TTABVUE 11-17, 66 TTABVUE 58-65, 66-71, 72-77, 89-93, 98-102, 121-125. To the extent that the evidence includes "ice blended drinks," the term does not appear in the dictionary, Opposer has not defined the term, and the photos do not clearly show an ice product.

[64] The outcome as to the fame of Opposer's mark would be no different if we had chosen to focus our analysis on one of the MONSTER ENERGY registrations for energy drinks. Based on the same record, we would find the mark famous for energy drinks, but the same lack of a commercial nexus between energy drinks and restaurants and frozen and flavored ice products would result also in a finding that the fame for energy drinks is not sufficient to reach to Applicant's restaurant services featuring frozen ice products.

Under the sixth *DuPont* factor, which assesses the number and nature of similar marks in use on similar goods or services, a mark's strength may be curtailed by extensive third-party use of similar marks with similar goods or services. *Jack Wolfskin Austrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1135-1136 (Fed. Cir. 2015). Notwithstanding Applicant's claim of "general recognition in the industry" that the term MONSTER is non-distinctive, the record is bereft of evidence that the term MONSTER is widely used in the restaurant industry in general.[65] *See Anthony's Pizza*, 95 USPQ2d at 1278 ("The testimony, third-party registrations, and telephone listings are sufficient to show that the name 'Anthony's' has been extensively adopted, registered and used as a trademark for restaurant services, in particular for Italian restaurants and pizzerias, and therefore that 'Anthony's' has a significance in this industry. … As a result, a mark comprising, in whole or in part, the name 'Anthony's' in connection with restaurant services should be given a restricted scope of protection."). In short, there is no factual basis for finding that the mark MONSTER ENERGY or the component term MONSTER has been weakened by third party use.

We find Opposer's registered mark MONSTER ENERGY as applied to restaurant services is entitled to the protection accorded a conceptually strong mark. We have carefully considered Opposer's evidence of fame, and find that the fame of its mark is

---

[65] 117 TTABVUE 17. To the extent that Applicant contends (117 TTABVUE 22-23) that Opposer's MONSTER marks have not reached the level of recognition of other "monsters" found in various dictionaries, such as monster trucks, the Cookie Monster, or Lady Gaga's Little Monster fans, such fame is not required.

limited to energy drinks, and does not extend to restaurants. *See Inter IKEA Sys. B.V. v. Akea, LLC*, 110 USPQ2d 1734, 1740 (TTAB 2014) (finding IKEA famous for retail store services in the field of furniture, housewares and home furnishings, but not for other products or services identified in its pleaded registrations).

3. **Similarity or Dissimilarity of the Parties' Marks**

The first *DuPont* factor focuses on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *DuPont*, 177 USPQ at 567. "Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *In re Inn at St. John's, LLC*, 126 USPQ2d 1742, 1746 (TTAB 2018), *aff'd mem.*, 777 F. App'x (Fed. Cir. 2019) (*quoting In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014)). In comparing the marks MONSTER ENERGY and ICE MONSTER, we are mindful that "[t]he proper test is not a side-by-side comparison of the marks, but instead whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties." *Cai v. Diamond Hong, Inc.*, 127 USPQ2d at 1801.

"[S]imilarity is not a binary factor but is a matter of degree.'" *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1085 (Fed. Cir. 2014) (*quoting In re Coors Brewing Co.*, 343 F.3d 1340, 68 USPQ2d 1059, 1062 (Fed. Cir. 2003)). Because the involved restaurant services are legally identical, "the degree of similarity between the marks necessary to support a determination that confusion is likely declines." *In re i.am.symbolic, llc*, 127 USPQ2d 1627, 1630 (TTAB 2018) (*citing Bridgestone Ams.*

*Tire Operations, LLC v. Fed. Corp.*, 673 F.3d. 1330, 102 USPQ2d 1061, 1064 (Fed. Cir. 2012)). One feature of a mark may be more significant than another, and it is not improper to give more weight to this dominant feature in determining the commercial impression created by the mark, provided the ultimate conclusion rests on a consideration of marks in their entireties. *See In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985). There is no mechanical test to select the dominant element of a mark. *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1059 (TTAB 2017).

"[W]ording often is considered the dominant feature of a mark comprising both literal and design elements because it is most likely to indicate the source of the services." *In re Inn at St. John's, LLC*, 126 USPQ2d at 1747. With marks "consisting of words and a design, the words are normally accorded greater weight because they are likely to make a greater impression upon purchasers, to be remembered by them, and to be used by them to request the goods." *In re Aquitaine Wine USA, LLC*, 126 USPQ2d at 1184 (*citing In re Viterra*, 101 USPQ2d at 1908 (internal citation omitted)).[66]

As discussed in connection with the strength of Opposer's mark, the first of the literal terms in the mark typically is the one which creates the strongest impression. *See In re Detroit Athletic Co.*, *supra*, and *Palm Bay*, *supra*. However, this is not always

---

[66] Applicant submits no evidence in support of his argument that "graphic elements of marks are becoming increasingly important as more and more companies move away from words toward symbols." 117 TTABVUE 39. Even if we were to accept the statement as generally true, as stated above, we would not characterize the blue background rectangle in Applicant's mark as an important graphic element or one which creates an impression any different than that created by the word ICE.

the case, and disclaimed or descriptive terms may be considered less significant features of the mark, even when they appear first. *See Double Coin Holdings, Ltd. v. Tru Dev.*, 2019 USPQ2d 3373409 at \*7 (TTAB 2019) ("Here, ROAD WARRIOR [for tires] looks, sounds, and conveys the impression of being a line extension of WARRIOR."); *In re Risesmart, Inc.*, 104 USPQ2d 1931, 1935 (TTAB 2012) ("We find that the marks would convey the same connotation with regard to the word ASSURANCE and the additional words in applicant's [marks TALENT ASSURANCE and JOB ASSURANCE] simply provide more information as to the nature of the services."); *Anheuser-Busch, LLC v. Innovopak Sys. Pty Ltd.*, 115 USPQ2d 1816, 1825 (TTAB 2015) ("the additional, generic word WINE in Applicant's mark [WINEBUD] is insufficient to distinguish it from Opposer's BUD mark").

Here, the hyperbolic term MONSTER forms the dominant feature of both MONSTER ENERGY and , and is applied to identical restaurant services. As discussed, Opposer's mark MONSTER ENERGY as applied to restaurant services suggests either a monster of energy or an energetic monster. Similarly, Applicant's mark as applied to restaurant services suggests a monster of ice or an icy monster. Moreover, because the term ICE appears in a different color and is physically separated by the term MONSTER by the cube background, the term ICE also may indicate the specialty of the restaurant, while the term MONSTER alone indicates the mark. Despite the difference in the additional words, and their different positions in their respective marks, the term MONSTER contributes the most to the overall commercial impression of both marks.

In coming to this conclusion, we find that the term ICE in Applicant's mark appears in the recitation of services, and is descriptive and disclaimed. *See Detroit Athletic Co.*, 128 USPQ2d at 1050 ("As described above, the non-source identifying nature of the words 'Co.' and 'Club' and the disclaimers thereof constitute rational reasons for giving those terms less weight in the analysis."); *In re Taylor & Francis (Publishers) Inc.*, 55 USPQ2d 1213, 1215 (TTAB 2000) ("Applicant's identification of goods expressly states that the series of non-fiction books upon which applicant uses its mark are "in the field of psychology." The word PSYCHOLOGY therefore is merely descriptive of the subject matter of applicant's books, as identified in the application …").

We accord the literal element ICE MONSTER greater weight than the blue rectangular design element, the stylized lettering, or the color blue in creating the impression left on prospective purchasers. The blue rectangle suggests an ice cube and so reinforces the term ICE. *See Herbko Int'l Inc. v. Kappa Books Inc.,* 64 USPQ2d at 1380 ("[T]he puzzle design does not convey any distinct or separate impression apart from the word portion of the mark. Rather, it serves only to strengthen the impact of the word portion in creating an association with crossword puzzles."); *In re Swatch Grp. Mgmt. Servs. AG,* 110 USPQ2d 1751, 1762 (TTAB 2014) ("the combination of the design with the word TOURBILLON reinforces the singular impression conveyed by the mark as a whole, which is nothing more than the significance of 'tourbillon'"), *aff'd mem.*, 599 F. App'x 959 (Fed. Cir. 2015). In fact, Applicant describes how it "surrounds the prominent and initial word in its mark –

ICE – with an attractive blue ice cube." 117 TTABVUE 40. The design reinforces the meaning of the term ICE in the Applicant's mark, and otherwise does not appreciably contribute to the commercial impression created by the mark.

Similarly, we find that the stylization and color of the lettering merely reinforces the term "ice" in the words . *Cf. "In re Serial Podcast, LLC*, 126 USPQ2d 1061, 1073 (TTAB 2018) ("The coloring of letters does not generally tend to render a mark distinctive."); *In re Grande Cheese Co.*, 2 USPQ2d 1447, 1449 (TTAB 1986) ("We think it likely that purchasers … would not see the lettering style or coloring of the generic designations as an indicium of source.").[67]

Because Opposer's mark is registered in standard characters, we must consider Opposer's mark "regardless of font style, size, or color." *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1258-59 (Fed. Cir. 2011). Opposer could employ the same color and stylization in its display of the MONSTER ENERGY mark as is shown for Applicant's ICE MONSTER mark. *See Cunningham v. Laser Golf Corp.*, 55 USPQ2d at 1847-48 ("The record shows that the registration for the LASERSWING mark contains a 'typed drawing.'[68] … Therefore, it is irrelevant that Cunningham has a particular display for his mark in commerce, and the Board was

---

[67] We do not disagree with Applicant's contention that "unique lettering is one element to be considered with regard to 'inherent distinctiveness' and the combination of unique lettering with other elements – such as color and shape – can enhance inherent distinctiveness." 117 TTABVUE 40. We disagree that this lettering, color and shape has a significant impact on the overall commercial impression of Applicant's mark.

[68] Effective November 2, 2003, the USPTO amended Trademark Rule 2.52 to replace the term "typed" drawing with the term "standard character" drawing. A typed mark is the legal equivalent of a standard character mark. *See In re Viterra Inc.*, 101 USPQ2d at 1909 n.2 (Fed. Cir. 2012).

correct to ignore those features."); Trademark Rule 2.52(a), 37 C.F.R. § 2.52(a), ("Applicants who seek to register words, letters, numbers, or any combination thereof without claim to any particular font style, size, or color must submit a standard character drawing that shows the mark in black on a white background.").

We disagree with Applicant that the "ICE MONSTER mark creates a completely different visual commercial impression … than any of the [Opposer's] relevant [pleaded] marks."[69] Applicant compares only the pleaded marks which include a design, and does not include the pleaded mark which is the focus of our analysis - MONSTER ENERGY in standard characters (Registration No. 5114854).

Considering the marks as a whole, we find the common term MONSTER, especially when applied to legally identical restaurant services, creates the same commercial impression, and this impression does not alter with the addition of the terms ENERGY, ICE, and the background design or stylization of Applicant's mark. We bear in mind that the "marks 'must be considered . . . in light of the fallibility of memory,' and 'not on the basis of side-by-side comparison,'" *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1085 (Fed. Cir. 2014) (*quoting San Fernando Elec. Mfg. Co. v. JFD Elecs. Components Corp.*, 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977), and that the proper focus is on the recollection of the average customer, who retains a general rather than specific impression of the marks. *In re i.am.symbolic, llc*, 127 USPQ2d 1627, 1630 (TTAB 2018). We find that the customer of MONSTER ENERGY restaurant services who encounters the same restaurant services offered under the

---

[69] 117 TTABVUE 41.

**ICE MONSTER** mark are likely to believe the services emanate from a single source. *Grandpa Pidgeon's of Mo., Inc. v. Borgsmiller*, 477 F.2d 586, 177 USPQ 573 (CCPA 1973) (noting that the marks comprising different designs of an elderly man had "a difference not likely to be recalled by purchasers seeing the marks at spaced intervals").

The first *DuPont* factor weighs in favor of likelihood of confusion.

### 4. **Actual Confusion**

The seventh and eighth *DuPont* factors respectively address "the nature and extent of any actual confusion" and "the length of time during and the conditions under which there has been concurrent use without evidence of actual confusion." *DuPont,* 177 USPQ at 567. "A showing of actual confusion would of course be highly probative, if not conclusive, of a high likelihood of confusion. The opposite is not true, however." *In re Majestic Distilling Co.*, 65 USPQ2d at 1205. *Accord Herbko Int'l, Inc. v. Kappa Books, Inc.*, 64 USPQ2d at 1380 ("[A] showing of actual confusion is not necessary to establish a likelihood of confusion."). "The absence of any reported instances of confusion is meaningful only if the record indicates appreciable and continuous use by [defendant] … of its mark for a significant period of time in the same markets as those served by [plaintiff] … under its mark[]." *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 94 USPQ2d at 1660).

Here, there is no dispute that there has been no actual confusion between the parties' respective marks and services.[70] While the opposed application is based on Applicant's allegation of a bona fide intent to use the mark, the record shows that Applicant has been using his mark in Asia since 1997.[71] In 2018, after the commencement of this proceeding, Applicant opened his first U. S. location in Oahu, Hawaii.[72] Applicant contends that it has been more than three years that his U.S. location has been open for business, that Oahu has a population of more than a million people, and that Applicant's arrival was the subject of online articles at Hawaii Foody, Spoon University food community, Honolulu Magazine, and JeffSetter Travel, so that there was ample opportunity for actual confusion.[73]

However, contrary to Applicant's argument, co-existence for three years without evidence of actual confusion when the extent of one parties' use is limited to services offered at a single location does not render the likelihood of confusion "highly dubious."[74] *See Barbara's Bakery Inc. v. Landesman*, 82 USPQ2d 1283, 1287 (TTAB 2007) (where the respective marks coexisted in the marketplace for at least nine years, absence of actual confusion nonetheless deemed "of little probative value" because of the absence of a significant opportunity for such confusion to occur, given "the minimal scope of applicant's actual use of her mark in the marketplace").

We find these *DuPont* factors are neutral.

---

[70] 112 TTABVUE 49; 117 TTABVUE 45-46.

[71] 97 TTABVUE 8.

[72] *Id.*

[73] 117 TTABVUE 47, 97 TTABVUE 46-66, 72-85.

[74] 117 TTABVUE 47.

5. **Variety of Goods on Which a Mark Is or Is Not Used**

The ninth *DuPont* factor considers "The variety of goods on which a mark is or is not used (house mark, "family" mark, product mark)." *DuPont*, 177 USPQ at 567. If a party in the position of plaintiff uses its mark on a wide variety of goods or services, then purchasers are more likely to view a defendant's related goods or services under a similar mark as an extension of the plaintiff's line. *DeVivo v. Ortiz*, 2020 USPQ2d 10153 at *14 (TTAB 2020). *See also Kenner Parker Toys,* 22 USPQ2d at 1458 ("Kenner's lengthy and extensive use of the PLAY-DOH mark on a wide variety of toy products emphasizes the mark's fame and strength."). This factor may favor a finding that confusion is likely if the goods or services are not obviously related, but has less impact if the parties' goods or services in issue are identical or closely related. *Genesco Inc. v. Martz*, 66 USPQ2d 1260, 1271 (TTAB 2003).

The goods and services demonstrating variety may be the subject of multiple registrations of the same mark by the same party. *Nike, Inc. v. WNBA Ent., LLC*, 85 USPQ2d 1187, 1195 (TTAB 2007) ("The fact that opposer applies its [registered] marks to a variety of sports products makes it more likely that purchasers, aware of opposer's use of the mark on a variety of sports products, when seeing a similar mark used in connection with backpacks, duffel bags and other sports bags, are likely to believe that these products are also being produced or sponsored by opposer."); *Uncle Ben's, Inc. v. Stubenberg Int'l, Inc.*, 47 USPQ2d 1310, 1313 (TTAB 1998) ("With respect to the goods, the fact that opposer applies its [registered] mark to a variety of products including rice mixes and stuffing mixes consisting primarily of bread is

significant. In our view, this makes it more likely that purchasers, aware of opposer's use of UNCLE BEN'S on a variety of food products, when seeing applicant's mark used in connection with a bread mix, are likely to believe that this product is also being produced or sponsored by opposer.").

The goods and services demonstrating variety may be collateral (not the registered) goods bearing, and services used in connection with, the mark sold in commerce by the owner of the mark or by a third party under a license. *See UMG Recordings Inc. v. Mattel Inc.*, 100 USPQ2d 1868, 1884 (TTAB 2011) ("Thus, particularly in view of the fame of opposer's MOTOWN marks in connection with its music and entertainment services, we find that applicant's 'toy vehicles' are sufficiently related to, and reasonably within the scope of, opposer's MOTOWN-branded collateral goods and are likely items in opposer's MOTOWN-branded retail store and museum gift shop, that confusion as to source is likely if identified by substantially similar marks."); *Time Warner Entm't. Co. v. Jones*, 65 USPQ2d 1650, 1663 (TTAB 2002) ("We find that the ninth *du Pont* factor (the variety of goods on which a mark is used) weighs in opposer's favor. The evidence establishes that opposer has licensed its Road Runner marks for use on a large number of diverse products."). *See also DC Comics v. Pan Am. Grain Mfg. Co.*, 77 USPQ2d 1220, 1225 (TTAB 2005) ("It is common knowledge, and a fact of which we can take judicial notice, that the licensing of commercial trademarks on 'collateral' products has become a part of everyday life.").

Opposer's brief contends that its range of products and services includes "beverages, restaurant services, promotion of sports and motor sports, stickers, clothing, accessories, and other goods and services."[75] Opposer does not introduce registrations or licensing agreements showing use of the MONSTER ENERGY and MONSTER marks on a variety of goods and services. Instead, Opposer cites as support the declaration of Opposer's CEO Sacks that, since 2002 when Opposer began use of its MONSTER ENERGY and MONSTER marks, the marks have been used continuously with "beverages, apparel, and other goods and services" (Par. 3); that its marks are displayed in connection with restaurant and bar services on cups, bar mats, waist aprons, and bottle openers (Par. 13); the restaurant and food truck at Opposer's headquarters (Par. 14); and the menu (Par. 15).[76]

The cited Sacks declaration does not refer to the stickers and accessories mentioned in Opposer's brief, and mentions the events featuring sports and motor sports only as the venue for the restaurant and bar services. Moreover, the cited paragraphs refer to exhibits (Nos. 4-11) all of which show the mark used in connection with restaurant, food truck, and bar services, and, indistinctly, a t-shirt bearing the mark:

---

[75] 112 TTABVUE 47.

[76] 112 TTABVUE 47 citing 67 TTABVUE Par. 3, 13-16.



*Figure 1 MONSTER t-shirt*[77]

"[C]ups, bar mats, waist aprons, and bottle openers" are mentioned in the declaration but not shown in the exhibits. Moreover, these goods do not show variety because they are merely tools for delivering the restaurant and bar services. The attached exhibits (Nos. 4-11) do not provide detail as to "other goods and services" or even items of apparel other than a t-shirt. *See DeVivo*, 2020 USPQ2d at *15 ("Opposer has provided only minimal information about sales of such goods sold under the ENGIRLNEER mark. We therefore find the ninth *DuPont* factor to be neutral with respect to a finding of likelihood of confusion.").[78]

We find the ninth *DuPont* factor to be neutral.

### 6. **Applicant's Right to Exclude Other Users**

Applicant argues that the eleventh *DuPont* factor indicates that confusion is unlikely. The eleventh *DuPont* factor considers "the extent to which applicant has a

---

[77] 67 TTABVUE 363.

[78] In view of the parties' legally identical restaurant services, evidence that Applicant's services would be considered an extension of Opposer's services is not necessary to support a finding of likelihood of confusion. *Made in Nature, LLC v. Pharmavite LLC,* 2022 USPQ2d 557, at *60 (TTAB 2022) ("Given the relatedness of the parties' identified goods, we find it unnecessary to rely on this factor. We therefore find the ninth *DuPont* factor to be neutral with respect to a finding of likelihood of confusion.").

right to exclude others from use of its mark on its goods."[79] *DuPont*, 177 USPQ at 567. The applicant's right to exclude is a right appurtenant to the applicant's trademark use.[80] *See Iancu v. Brunetti*, 139 S. Ct. 782, 2019 USPQ2d 232043, at *2 (2019) ("Registration of a mark is not mandatory. The owner of an unregistered mark may still use it in commerce and enforce it against infringers.").[81] In a likelihood of confusion determination, "applicant's right to exclude" considers applicant's place in

[79] As the factor is described by *DuPont*, it applies to the applicant. In Board proceedings, "applicant" is construed to include not only the subject of an ex parte refusal, and the defendant in an opposition, but the respondent in a cancellation. *See Cunningham v. Laser Golf Corp.,* 55 USPQ2d at 1847 ("With regard to [Respondent's] right to exclude, [Respondent] argues that the Board ignored the 'relevance of descriptive use of the term 'laser' in golfing with respect to [sic, the] right to exclude.'").

[80] This use-based factor generally will not arise in proceedings involving an applicant who has not begun use of the mark. In *DeVivo v. Ortiz*, *supra*, the common law user opposed an intent-to-use application, filed under Section 1(b) of the Trademark Act, 15 U.S.C. 1051(b), a type of application not available when the *DuPont* court established its likelihood of confusion test. In *DeVivo*, the Board found the eleventh factor to be neutral "because Opposer has not provided any significant information about the advertising and sales of her goods and services offered under the ENGIRLNEER mark." *DeVivo*, 2020 USPQ2d 10153 at *15. On its face, the eleventh factor, "the extent to which applicant has a right to exclude others from use of its mark on its goods," involves an applicant's, and not an opposer's, right to exclude other users. The reference to Opposer's mark was a reference to the difficulty in assessing the impact on Opposer's common law rights if a registration, with the consequent right to exclude Opposer's use, were to issue from the intent-to-use application.

[81] While the right to exclude springs from use, *Morehouse Mfg. Corp. v. J. Strickland & Co.*, 407 F.2d 881, 160 USPQ 715, 720 (CCPA 1969), a certificate of registration is "prima facie evidence" of, among other things "the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate." 15 U.S.C. 1057(b). In circumstances not present here, the eleventh *DuPont* factor may consider an applicant's ownership of current U.S. registrations for the same or similar marks on the same or similar goods and services. *See Made in Nature, LLC v. Pharmavite LLC*, 2022 USPQ2d 557, at *62 (the Board finds the eleventh factor neutral, asserting "While brand extension is a desirable business goal, Applicant provides no legal support for finding that this recognition of its registered mark for different goods provides Applicant any right to exclude others from using the NATURE MADE mark, or similar marks, on food and beverages."). *Cf. In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198, 1205 (TTAB 2009) ("Contrary to applicant's argument, applicant's ownership of a now-cancelled registration of the mark … does not establish applicant's right to exclude others from use of the mark.").

the market and any resulting consumer perception as defined by the applicant's trademark use, insofar as that use is reflected in the mark and goods described in the application. *See B&B Hardware, Inc. v. Hargis Ind., Inc.*, 575 U.S. 138, 113 USPQ2d 2045, 2054 (2015) ("the Board typically analyzes the marks, goods, and channels of trade only as set forth in the application and in the opposer's registration, regardless of whether the actual usage of the marks by either party differs.") (citation omitted).[82]

Here, Applicant contends that the following demonstrates his right to exclude other users:

> [Applicant] has taken aggressive action to protect the ICE MONSTER mark in the United States… First of all, [Applicant] has successfully caused several entities that have attempted to use the term ICE MONSTER as a trademark to cease and desist. … [Applicant] has obtained a trademark for the ice cubed man … [Applicant] has been using the ICE MONSTER as a trademark for ices parlors since 1996 (in Taiwan). It has a significant investment in time, money, and brand recognition, and emotional attachment to that name. [Applicant] created this mark for ices parlors and started using it in commerce in Taiwan before [Opposer] was even in business. For more than 25 years, the term ICE MONSTER has been an integral part of [Applicant]'s business operations. Now that [Applicant] is coming to the U.S. with ice parlors in Hawaii and (soon) in Seattle, WA, [Applicant] wishes to obtain recognition and have the tools to protect a mark that it has nurtured a pan-Asian basis.[83]

---

[82] *Accord Stone Lion* 110 USPQ2d at 1162-1163 (internal citations omitted) ("It would make little sense for the Board to consider only the parties' current activities when the intent-to-use application, not current use, determines the scope of this post-grant benefit."); *Cunningham v. Laser Golf Corp.,* 55 USPQ2d at 1847 ("[Registrant] Cunningham also argues that there was no analysis of the 'evidence of use of the mark on the goods as another relevant factor.' … it is irrelevant that Cunningham has a particular display for his mark in commerce, and the Board was correct to ignore those features.").

[83] 117 TTABVUE 48. We take this opportunity to note that, while this argument may invoke the kinds of evidence we frequently see under *DuPont*'s fifth factor, there is a key difference. *DuPont* factor five looks at the fame or strength of the prior user's (or registrant's) mark, in order to determine the scope of protection to which it is entitled. *See, e.g., Omaha Steaks*, 128 USPQ2d at 1689; *Kenner Parker Toys*, 22 USPQ2d at 1456. But *DuPont*'s eleventh factor concerns evidence of an applicant's place in the market and any resulting consumer perception as defined by the applicant's trademark use and does not assess the applicant's strength or fame. *See Loreal S.A. and Loreal USA, Inc. v. Marcon*, 102 USPQ2d 1434, 1438

The Board has previously considered an applicant's right to exclude as assessing whether the applicant had achieved "an appreciable level of consumer recognition" **and** whether the applicant could demonstrate having "successfully asserted its [trademark] rights." *McDonald's Corp. v. McSweet, LLC*, 112 USPQ2d 1268, 1285 (TTAB 2014). *Cf. U. S. Patent & Trademark Office v. Booking.com B.V.*, 140 S. Ct. 2298, 2020 USPQ2d 10729, at *6-7 (2020) ("consumer perception" is "a bedrock principle of the Lanham Act"). In that case, the Board found that the applicant's MCSWEET pickled vegetables could be used as toppings in connection with the opposer's family of MC-formative sandwiches, and were complementary goods. *McSweet*, 112 USPQ2d at 1282. Under *DuPont* factor eleven, the applicant argued that its trademark use on the specific goods in its application had resulted in consumer recognition without actual confusion. *Id.* at 1284. While offered evidence of the applicant's sales and promotional expenditures similar to evidence considered when assessing the fame or strength of the prior user's mark, the Board did not assess the fame of the applicant's mark. Instead, the Board in *McSweet* focused on the dearth of evidence regarding the nature of the applicant's common law use, finding the

---

(TTAB 2012) ("[A]s a matter of law, the fame of a registered or previously used mark can never support a junior party; this *DuPont* factor can only support the senior party.") *citing Kenner Parker Toys* at 1456.. Similarly, evidence of successful enforcement frequently is submitted to show strength or fame under the fifth *DuPont* factor, but, again, under *DuPont*'s eleventh factor, we are concerned only with an applicant's showing of successful enforcement and how that impacts market realities. Finally, we note that we are not concerned with mere efforts at enforcement, but rather with the context surrounding successful enforcement and how that evidence bears on consumer recognition of any place applicant may have in the market. *Cf. Omaha Steaks Int'l,* 128 USPQ2d at 1693 (distinguishing enforcement efforts from public recognition under fifth *DuPont* factor); *Harry Winston, Inc. v. Bruce Winston Gem Corp.*, 111 USPQ2d 1419, 1444-45 (TTAB 2014) (finding a registrant's enforcement efforts were successful under the fifth *DuPont* factor).

"record is not clear about when Applicant first used the MCSWEET mark," and concluding "Applicant's sales figures and Applicant's advertising and promotional expenditures are not sufficient to establish an appreciable level of consumer recognition." *Id.* at 1284-85. The *McSweet* decision, however, does *not* signal that the Board will determine the fame or strength of an applicant's mark under the eleventh *DuPont* factor. Evidence of the kind offered by the applicant in *McSweet* may be used for a different purpose, namely assessing market realities, such as consumer recognition of any place the applicant may have in the market. As discussed, the relationship between the prior user's and the applicant's goods and services must be determined based on how the applicant's goods and services are identified in the application. To the extent the applicant's use on the identified goods has been recognized by consumers, this is not impermissible extrinsic evidence used to expand or contract the goods and services as described in the application, but illustrates and corroborates the place the applicant occupies in the market with respect to the identified goods and services.[84]

In sum, *DuPont* factor eleven does not consider the strength or fame of the applicant's mark in the same way the scope of protection is determined for the prior user under *DuPont* factor five. The factor may be useful to determine how marketplace realities and consumer perception defined by applicant's common law

---

[84] To illustrate, an applicant, seeking registration of a mark for salt and pepper shakers and opposed by the owner of a registration for the same mark for plates, may submit evidence of its common law use under *DuPont* factor eleven as proof of the market reality of the coexistence of salt and pepper shakers and plates under the same mark by different parties to be weighed as part of the likelihood of confusion analysis.

use and consequent right to exclude other users affects the likelihood of confusion. While the factor may consider any successful trademark enforcement activity in which the applicant has engaged, the purpose is not to assess the scope of protection of the applicant's mark (as in the fame analysis for the prior user's mark), but to discern the marketplace reality and consumer perception of Applicant's use. In this way, when relevant evidence of an applicant's right to exclude is offered under *DuPont* factor eleven, it may impact the weight given to other *DuPont* factors in our ultimate weighing of the factors.

In the present case, there are two main problems with Applicant's argument concerning *DuPont* factor eleven. First, the Opposer's and Applicant's services are identical. With identical services, we are faced with circumstances that differ from those when an applicant in an opposition proceeding relies on common law use of a mark for goods or services potentially related to those in a conflicting prior registration. In cases where the goods or services are related (not identical), we determine whether the applicant's uses suggest confusion is unlikely.

Second, the assertions of the use of his mark in Applicant's brief are based on testimony which was withdrawn. The only other evidence Applicant placed into the record (98 TTABVUE 13) is a copy of his registration certificate for the design mark

for "frozen confections, namely, ices" and "retail restaurant services, namely, ice confection parlors including ices, drinks and confectionery snacks" (Registration No. 5971045 issued January 28, 2020). This registration for an unrelated mark has

no bearing on the likelihood of confusion between Applicant and Opposer. *See Made in Nature, LLC v. Pharmavite LLC*, *supra.* For these reasons, the eleventh *DuPont* factor does not apply or is at best considered neutral in our analysis.

### 7. Any Other Established Fact Probative of the Effect of Use

The thirteenth and last *DuPont* factor considers "any other established fact probative of the effect of use." *DuPont*, 177 USPQ at 567. A party's bad faith in adopting a mark is relevant to this factor. *QuikTrip W., Inc. v. Weigel Stores, Inc.*, 984 F.3d 1031, 2021 USPQ2d 35, at \*4 (Fed. Cir. 2021). *See also J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 18 USPQ2d 1889, 1891 (Fed. Cir. 1991) ("Whether there is evidence of intent to trade on the goodwill of another is a factor to be considered."); *Jewelers Vigilance Comm., Inc. v. Ullenberg Corp.*, 853 F.2d 888, 7 USPQ2d 1628, 1630 (Fed. Cir. 1988) ("proof of intent to trade on another's goodwill" can provide "persuasive evidence of likelihood of confusion") (citation omitted). A finding of bad faith relevant to likelihood of confusion requires adoption of the mark with "an intent to confuse" customers. *QuikTrip W., Inc.*, 2021 USPQ2d 35, at \*4; *Bd. of Trs. of Univ. of Ala. v. Pitts,* 107 USPQ2d 2001, 2024 n. 89 (TTAB 2013) (vacated pursuant to settlement on appeal); *Chi. Bears Football Club, Inc. v. 12th Man/Tennessee LLC,* 83 USPQ2d 1073 (TTAB 2007); *Big Blue Prod. Inc. v. Int'l Bus. Mach. Corp.*, 19 USPQ2d 1072, 1076 (TTAB 1991).

The entirety of Opposer's proof that Applicant adopted his mark in bad faith to confuse Opposer's customers is Applicant's admission that "he was familiar with Monster before he selected and began using Applicant's mark in the

U.S."[85] Opposer cites no legal support for his contention that this is sufficient.[86] In fact, the Federal Circuit and the Board repeatedly have held that mere knowledge of a prior similar mark is insufficient to demonstrate bad faith in adoption. *QuikTrip W. Inc.*, 2021 USPQ2d 35, at *4; *Action Temp. Serv. Inc. v. Labor Force Inc.*, 870 F.2d 1563, 10 USPQ2d 1307, 1309 (Fed. Cir 1989); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 4 USPQ2d 1793, 1798 (Fed. Cir. 1987); *Bd. of Regents, Univ. of Tex. Sys. v. S. Ill. Miners, LLC*, 110 USPQ2d 1182, 1196 (TTAB 2014); *Ava Enters., Inc. v. Audio Boss USA, Inc.*, 77 USPQ2d 1783, 1787 n.8 (TTAB 2006); *Carefirst of Md., Inc. v. FirstHealth of the Carolinas, Inc.*, 77 USPQ2d 1492, 1512 (TTAB 2005); *NASDAQ Stock Market Inc. v. Antartica S.r.l.*, 69 USPQ2d 1718, 1733 (TTAB 2003); *Time Warner Entm't Co. v. Jones*, 65 USPQ2d at 1653. There are no reasons here to deviate from this settled point, and we find the evidence that Applicant knew of Opposer's use of its mark insufficient to support a finding of bad faith adoption intended to confuse customers.

While evidence of bad faith adoption typically will weigh against an applicant, good faith adoption typically does not aid an applicant attempting to establish no

---

[85] 112 TTABVUE 47.

[86] In response to the undisputed evidence that Applicant was using the literal element of his mark in Taiwan long before Opposer began its use in the United States, Opposer's rebuttal brief contends (119 TTABVUE 17-18) that foreign trademark rights are not the basis for trademark rights in the United States. *Green Spot (Thailand) Ltd. v. Vitasoy Int'l Holdings Ltd.*, 86 USPQ2d 1283, 1285 (TTAB 2008). Applicant's use of his mark in other countries prior to Opposer's adoption of its mark does not indicate priority but a defense to Opposer's accusation that Applicant adopted Opposer's mark in bad faith.

likelihood of confusion. *J & J Snack Foods*, 18 USPQ2d at 1891; *Eveready Battery Co., Inc. v. Green Planet, Inc.*, 91 USPQ2d 1511, 1516 (TTAB 2009).

We find this factor is neutral.

8. **Balancing the Factors**

We have considered all of the arguments and evidence of record, and all relevant *DuPont* factors. In sum, we find that the parties' marks are very similar, the services are legally identical in part, the channels of trade and classes of purchasers to whom sales are made are presumed to be the same, and all other factors are neutral.

When we balance the *DuPont* factors, we conclude that Applicant's mark is likely to create confusion with Opposer's registered standard character MONSTER ENERGY mark.

**DECISION**

The notice of opposition to registration of Applicant's mark for "restaurants, coffee shops, ices parlors, snack bars with take-out for flavored and fruit ice products, and specifically excluding frozen yogurt" on the ground of likelihood of confusion is sustained, and registration to Applicant is refused.